United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          NORTHERN DISTRICT OF CALIFORNIA
10
11   JAIME CARDENAS,                          No. C-13-3321-DMR
12            Plaintiff(s),                   **ORDER GRANTING PLAINTIFF'S
                                              MOTION FOR SUMMARY JUDGMENT
13        v.                                  AND DENYING DEFENDANT'S
                                              MOTION FOR SUMMARY JUDGMENT
14   CAROLYN W. COLVIN,                       AND REMANDING FOR FURTHER
                                              PROCEEDINGS**
15            Defendant(s).
     _____/
16
17          Pursuant to 42 U.S.C. § 405(g), Plaintiff ("Plaintiff") seeks review of his application for

18   disability insurance benefits.  Defendant Social Security Commissioner ("Defendant" or

19   "Commissioner") denied his application after determining that Plaintiff was not disabled under Title

20   II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  Plaintiff now requests judicial review of the

21   Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Both parties filed motions for summary

22   judgment.  For the reasons stated below, the court **grants** Plaintiff's motion for summary judgment

23   and **denies** Defendant's motion for summary judgment, and **remands** this action for further

24   proceedings.

25                          **I.  Procedural History**

26          Plaintiff previously applied for disability benefits in 2004 and 2007.  A.R. 35, P.'s Mot.

27   Summ. J. [Docket No. 21] at 2.  On November 17, 2009, Plaintiff filed a third application for a

28   period of disability and disability insurance benefits under Title II of the Act, alleging disability

beginning September 23, 2003 due to low back and hip injury, depression, anxiety, insomnia, and headaches.  A.R. 144-52, 174.  The agency denied Plaintiff's claim on February 10, 2010, and subsequently denied it again upon reconsideration on July 19, 2010.  A.R. 78-82, 86-90.  On June 29, 2011, Administrative Law Judge (ALJ) Maxine Benmour held a hearing at which Plaintiff, his wife, his non-attorney representative, and a Spanish language interpreter were present.  A.R. 15.  Plaintiff and his wife Maria Cardenas provided testimony, as did Jeff Beeman, a vocational expert ("VE"). A.R. 33.

On August 23, 2011 the ALJ issued a written decision finding Plaintiff not disabled under Title II of the Social Security Act.  A.R. 25.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the Commissioner's final decision.  A.R. 1-5.  Plaintiff then filed this action, challenging a single aspect of the ALJ's decision.  Namely, plaintiff argues that the ALJ failed to credit his testimony that he could only sit for a certain period of time before having to stand and walk around, a requirement that would render Plaintiff unemployable according to the testimony of the VE.

## II.  Factual Background

### A.  Background

The record contains the following information.  Plaintiff was born in November 1967 and was 35 years old as of the alleged onset date of his disability.  A.R. 131.  Plaintiff completed the sixth grade in Mexico and is unable to read and write in English.  A.R. 17, 36, 181.  Plaintiff came to the United States in 1983, and worked as an orchard laborer from 1983 to 2003 and as a cleaner in a lumber mill in 1997.  A.R. 37, 60, 175.  Plaintiff's work as a laborer required him to drive a tractor, a backhoe, a trimmer, and occasionally a forklift.  A.R. 175.

On December 4, 2002, while working as a laborer and foreman for Ruddick Ranch, Plaintiff fell off a tractor and injured his back and right hip.  A.R. 17, 37, 381-82, 158, 415, 469.  After this incident, Plaintiff continued working for approximately ten months with restrictions provided by his physician, although Plaintiff states that his employer required that Plaintiff perform the regular duties of his employment.  A.R. 381, 469.  Plaintiff stopped working on September 23, 2003.  A.R. 381, 469.  Plaintiff subsequently had two surgeries performed on his right hip (in 2006 and again in

United States District Court

For the Northern District of California

2007) and saw a psychiatrist, all through worker's compensation.  A.R. 55-58, 399-400.  Plaintiff also received a settlement through worker's compensation of about $6,000 to be used for medical treatment.  A.R. 58.  Plaintiff testified that he did not engage in substantial gainful activity during the period from his alleged onset date of September 23, 2003 through his date last insured of December 31, 2008.

Plaintiff testified that his right hip bothered him more now than it did in 2003, and rated the pain in his right hip as between 8 and 10 out of 10.  A.R. 38.  Plaintiff felt pain in his right hip and "almost constant" numbness in his right leg when he was sitting.  A.R. 38-39.  He could sit 15-20 minutes before his pain was so bad that he had to get up, but testified that after standing up, he could sit down again, and he could alternate between sitting and standing "all day."  A.R. 39.  Plaintiff could stand for about 10-15 minutes.  A.R. 40.  He could walk a quarter to half a mile before having to stop due to pain.  A.R. 39.  Plaintiff also described constant pain in his lower back (which he rated between 8 and 9 out of 10) and neck, which he testified prevented him from sitting up straight.  A.R. 40-41.  Plaintiff also testified that his left hip had been bothering him for two to three years, and he rated the pain there a 7 out of 10.  A.R. 41.  Plaintiff took several medications, including a muscle relaxant as well as pills for depression, pain, and nerves.  A.R. 42.  Plaintiff testified that the medications alleviated "a little bit" of his pain, including by reducing his back pain to a 4 or 5 out of 10.  A.R. 43.  Plaintiff had trouble sleeping, slept only three hours per night, and took sleeping pills about every two days to help him sleep. A.R. 44-45.  Plaintiff stated that the two surgeries he had received on his hip did not help with his pain.  A.R. 50.  Plaintiff stated that he had fallen twice because his leg had locked up.  A.R. 51.

Plaintiff testified that he lived with his wife and four children, who were aged 12 to 22 at the time of the hearing.  A.R. 44.  He was able to do some housework, including helping his wife with cooking, washing the dishes, washing the car, and folding laundry for 10-15 minutes.  A.R. 44-46.  Plaintiff did not have trouble taking a shower, except when it required bending over, and did not need assistance to dress, wash his hair, shave, or put on his shoes and socks.  A.R. 45.  During a typical day, Plaintiff was at home with his children, and could sit, stand, and walk.  A.R. 46.  Occasionally Plaintiff walked with his wife outside of the house for about half an hour, and every

1   two or three weeks, Plaintiff bought groceries with his wife.  A.R. 47.  Plaintiff testified that even on

2   good days, he had to take breaks from housework every 20 minutes.  A.R. 48.

3          Plaintiff's wife Maria Cardenas testified that she had been married to Plaintiff for over 23

4   years.  She stated that Plaintiff complained about pain in his back and hips "all the time," including

5   in his sleep, and that she could hear "a big pop" sound from his hip.  A.R. 52-53.  She testified that

6   Plaintiff did not do much housework, but tried to help every now and then by doing the dishes or

7   attempting to cook, and occasionally drove the kids to school and picked them up.  A.R. 53-54, 56.

8   Plaintiff's wife stated that Plaintiff was taking Wellbutrin, Lexapro, Norco, Lyrica, and occasionally

9   took Advil, Advil PM, and Lunesta for sleeping.  A.R. 54.  She testified that Plaintiff was

10  "depressed all the time," that he was shaky, that he did not want to eat or go out, and that she had

11  seen him crying at times.  A.R. 55.

12  **B. Hypothetical to VE Beeman**

13         The ALJ asked VE Beeman whether a person with the following limitations would be able to

14  perform Plaintiff's past work: lifting and carrying ten pounds occasionally and less than ten

15  frequently, sitting six hours in an eight-hour day and standing/walking two hours, needing to

16  alternate sitting and standing as needed, no climbing of ladders, ropes, or scaffolds, no repeated

17  bending or stooping, occasional climbing of ramps and stairs, occasional balancing, kneeling,

18  crouching, and crawling, and working only one to two step, simple instruction jobs.  A.R. 60.  VE

19  Beeman stated that such a person would not be able to perform Plaintiff's past work, but gave

20  examples of two other unskilled jobs (machine operator, assembler) in the regional and national

21  economy.  A.R. 61.  VE Beeman stated that if the hypothetical person could not read or write

22  English, the numbers of those two jobs would be eroded by at least 50%.  A.R. 61.

23         Plaintiff's non-attorney representative stated that she believed the ALJ's hypothetical did not

24  discuss Plaintiff's limitations on sitting and standing.  VE Beeman then stated, "Judge Benmour,

25  how often is the sit/stand option?  I mean, for example, if it rises to something that's going to be

26  every ten minutes, then you really would erode any kind of work."  A.R. 62.  The ALJ then posed a

27  hypothetical individual who had to stand every "couple of minutes whenever the person[] feels the

28  need to get up."  A.R. 62.  VE Beeman opined that if that individual was "at his work station and it's

United States District Court

For the Northern District of California

a couple of minutes from a sedentary to [] standing and he's continuing to work, I don't see that as a serious obstacle there as far as erosion." A.R. 62.

Plaintiff's non-attorney representative then elicited further testimony from Plaintiff, during which Plaintiff testified that when he alternated between sitting and standing, he did not simply need to stand but that he also needed to walk around, so that sitting and standing in one place would not work. A.R. 63. He testified that he could sit for 10-15 minutes at a time, but then would have to leave his work area to walk 5-10 minutes. A.R. 63. Plaintiff's wife agreed with Plaintiff's testimony regarding this limitation. A.R. 63. VE Beeman then opined that somebody who would have to walk around for 5-10 minutes after sitting for 10-15 minutes, assuming that person "wouldn't be continuing to work with continuity when he's walking around," would not be employable. A.R. 64. VE Beeman testified that a person who required "walking even ten minutes of an hour throughout the day" would not be employable. A.R. 64.

## C. Plaintiff's Relevant Medical History[1]

### A. 2003-2005: Treatment by Dr. Peter Pappas

Plaintiff was treated by Dr. Pappas between 2003 and 2005. The record includes treatment notes from 17 visits dated from September 23, 2003 until November 15, 2005. A.R. 234-55. During this time, Plaintiff received six lumbar epidural facet injections from October 2003 until April 2004. A.R. 258-276. In the last treatment record available from Dr. Pappas, dated November 15, 2005, Dr. Pappas stated that Plaintiff had been deemed permanent and stationary and that he was not a candidate for surgery at that time, and recommended treatment through epidural injections instead. A.R. 234.

### B. 2005: Treatment by Dr. William Bowen

The record includes treatment notes from Dr. William Bowen, an orthopedic surgeon, from 18 visits between August 4, 2005 and June 19, 2008. A.R. 335-76. On August 4, 2005, Dr. Bowen noted that Plaintiff was seen by Dr. Pappas for two years and has "spent two years undergoing

---

[1] The court limits its summary of Plaintiff's medical history to the records relevant to the issue raised by Plaintiff in this appeal. Consequently, the court does not discuss Plaintiff's mental health history, as Plaintiff's appeal does not implicate those records.

United States District Court

For the Northern District of California

epidural blocks with the thought of possibly having surgery . . . . [but] was finally told that surgery would not help him and he was then made permanent and stationary." A.R. 232. Dr. Bowen noted that Plaintiff was then seen by a qualified medical examiner, Dr. Michael Sommer, "who felt that he was not permanent and stationary, and that he had a problem with his right hip, and that he was advised to see me for evaluation of the hip." A.R. 232. Dr. Bowen recommended an x-ray and an MRI. A.R. 233.

**C.  2006: Examination by Dr. Thomas Miles**

On January 19, 2006, Dr. Thomas Miles, an orthopedic surgeon, examined Plaintiff in his capacity as an Agreed Medical Evaluator. A.R. 381. Dr. Miles noted that "[t]here is MRI evidence of a labral tear superiorly of the right hip." A.R. 387. Dr. Miles also stated that Dr. Bowen's discretion, Plaintiff may want to consider a referral to a surgeon for possible hip arthroscopy. A.R. 287.

On February 28, 2006, Dr. Miles provided a supplemental report. A.R. 379-380. In the supplemental report, Dr. Miles stated:

> I have been asked  . . . to provide a disability rating utilizing the AMA Guides . . . . Mr. Cardenas has no evidence of physical examination of loss of motion of his hip, and I could detect no evidence of any motor loss of the hip joint.  There was no limb length discrepancy, although he did have an antalgic gait.  The plain x-rays revealed no evidence of arthritic change of his hip joint . . . . I would provide him with a 7% whole person impairment using Table 17-5 in that he has a mild antalgic limp, shortened stance phase, and documented changes in his hip, which are not arthritic as requested of this section, but again the Guides fail to address a situation such as a labral tear.

A.R. 379-380.

**D.  2006-2007: Treatment and Surgeries by Dr. Mark Lawler**

On June 12, 2006, Plaintiff was seen by orthopedic surgeon Dr. Mark Lawler on referral by Dr. Bowen for possible right hip surgery. A.R. 488. Dr. Lawler reviewed an MRI of Plaintiff's right hip dated September 20, 2005 (A.R. 501), and noted that it showed tearing of the anterior superior labrum. Dr. Lawler stated that "[s]eeing as the patient has been having pain and [l]imitations for upwards of 4 years and has failed extensive nonoperative treatment, I do feel he is an excellent candidate for hip arthroscopy" and recommended arthroscopic surgical repair of the labrum. A.R. 488.

United States District Court

For the Northern District of California

On July 13, 2006, Plaintiff underwent right hip arthroscopy with debridement of labrum, extensive debridement of synovium, acetabular rim trimming, and osteochondroplasty of the femoral neck.  A.R. 507-08.  Plaintiff initially did well, but then had a slow recovery and an increase in pain. A.R. 18, 486, 513-14.  Dr. Lawler noted that Plaintiff was still having hip pathology, and recommended revision arthroscopic surgery.  A.R. 486, 513.  An MRI of Plaintiff's right hip dated December 19, 2006 showed increased extent of altered signal in the superior-anterior aspect of the labrum, most consistent with tears, which was an increase when compared to the MRI dated September 20, 2005, as well as a slight increased signal in the soft tissues adjacent to the iliopsoas tendon insertion onto the lesser trochanter.  A.R. 18, 497.

On May 31, 2007, Plaintiff underwent a second surgery on his right hip, also performed by Dr. Lawler, consisting of an arthroscopy with revision debridement of labrum, extensive debridement of synovium, revision acetabular rim trimming, and revision osteochondroplasty of the femoral neck.  A.R. 513.

**E.  2007-2009: Post-Surgery MRIs and Treatment Notes from Drs. Lawler and Bowen**

After Plaintiff's second surgery, Plaintiff continued to be treated by Drs. Lawler and Bowen. On July 10, 2007, Plaintiff stated that he did not feel improved from the surgery and reported pain in his hip and numbness and tingling in his thigh, but Dr. Lawler opined that he believed Plaintiff was "slowly improving."  A.R. 490.  On August 27, 2007, Dr. Lawler noted that Plaintiff stated he was still having pain in his back and groin, with occasional "popping" in his back, as well as numbness, tingling, weakness, and a hot burning sensation in his lower extremities on both sides.  A.R. 480. Dr. Lawler stated:

> I think he is having some snapping of the iliopsoas in his hip, but I am more concerned about his low back.  The majority of his complaints appear to be coming from his low back.  He is also having symptoms on his left extremity as well, including sensations of numbness, tingling, and weakness.  Based on this, I think further investigation is indicated to try to clarify the picture.  We will need to order an MRI of his lumbosacral spine.  I do not think he can return to any work-related duties until further notice.

A.R. 480.

Dr. Bowen treated Plaintiff about every 4-6 weeks between September 2007 and June 2008. A.R. 336-348.  Dr. Bowen noted that Plaintiff stated that he continued to have severe pain and

discomfort, becoming progressively worse.  A.R. 338, 340, 346.  In December 2007, Dr. Bowen

ordered an MRI of Plaintiff's lumbosacral spine, which showed disc disease at L4-5 that Dr. Bowen

did not believe required surgical intervention at that time.  A.R. 342.  On April 3, 2008, Dr. Bowen

noted that Plaintiff had continued right hip pain of unclear etiology, stated that "it has never been

determined for sure whether there is nerve root rotation," and suggested EMG and conduction

studies of both lower extremities to see if there were neurogenic causes for Plaintiff's pain.  A.R.

339.  In Dr. Bowen's final treatment note, dated June 19, 2008, Dr. Bowen stated:

> [Plaintiff] is permanent and stationary with regards to his injury.  He is not in need of further actual medical treatment at this time.  However, he has had an arthroscopy of the hip and I would not be surprised [if] he develops degenerative changes in the hip joint at a later time.  For that reason, provisions should be made for continued medical treatment.  The patient is also unable to return to his previous type of employment and for that reason, I feel he is a qualified injured worker and should undergo rehabilitation into a lighter line of work.

A.R. 336-37.

**F.  2009: Examination by Dr. Miles**

Dr. Miles reexamined Plaintiff on July 10, 2009.  He noted that Plaintiff had not had

treatment over the past year, since a visit with Dr. Bowen in July 2008.  A.R. 412.  Dr. Miles found

that Plaintiff had chronic lumbar strain with mild degenerative disc disease L4-5.  A.R. 411.  Dr.

Miles stated that Plaintiff had reached maximum medical improvement and there was no need for

further surgical intervention either for his hip or his back, "except there is a [possibility] that with

time he may develop gradual progression of degenerative changes."  A.R. 412.  Dr. Miles noted that

Plaintiff's back may require ongoing medical management with use of non-narcotic medications,

and sparing use of narcotics, as well as weight loss, at-home exercise, and physical therapy.  A.R.

412.  Dr. Miles also noted that Plaintiff had not accessed vocational rehabilitation, even though it

had been offered.  A.R. 412.

**G.  2009: Treatment by Dr. Lawler**

The next medical treatment note in the record after Dr. Bowen's June 2008 note is from Dr.

Lawler, dated October 19, 2009.  In that note, Dr. Lawler opined that Plaintiff returned "after a long

absence."  A.R. 476.  Dr. Lawler noted that Plaintiff was "having recurrent popping within his right

hip, causing a catching sensation and significant pain," as well as "persistent nightly numbness or

United States District Court

For the Northern District of California

1  tingling with burning into his legs, down the posterior thighs, onto the bottoms of his foot

2  bilaterally."  A.R. 476.  Dr. Lawler stated that Plaintiff "is becoming increasingly disabled from

3  this."  A.R. 476.

4          Dr. Lawler recommended an MRI of Plaintiff's right hip, to see if there was any new

5  pathology within the right hip, as well as an MRI of Plaintiff's lower back "given the new increase

6  in neurological symptoms."  A.R. 476.  Dr. Lawler opined that treatment of Plaintiff's back would

7  likely require referral to a spinal specialist for repeat epidural steroid injections or possibly surgical

8  consultation.  A.R. 477.  With respect to Plaintiff's hip, Dr. Lawler stated:

> [U]nfortunately he has already had two hip arthroscopies, which unfortunately has not given him significant pain relief. At this point and [sic] time he is probably a candidate for hip replacement, either hip resurfacing or primary total hip arthroplasty. I am not very confident that a repeat surgery despite his mechanical symptoms would be much use. We will get the above information and call the patient with our treatment recommendations.

A.R. 477.

### H.  November 13, 2009: MRIs of Hip and Spine

An MRI of Plaintiff's right hip dated November 13, 2009 was "unremarkable."  A.R. 492.
The report noted that Plaintiff's "right femoral head is spherical and normally seated within a
normally shaped right acetabulum.  There is a normal marrow signal seen on both sides of the joint.
[There is] no evidence for fracture, avascular necrosis, erosions, or reactive edema from arthrosis.
The remaining visualized marrow of both proximal femors and the pelvis appears unremarkable. No
joint effusion is seen.  The labrum shows no obvious tear. No bursal fluid collections are noted. The
muscular structures are symmetric.  Specifically, no muscle edema, blood products, mass or cyst are
seen.  No adenopathy or hernia is noted."  A.R. 492.

An MRI of Plaintiff's lumbar spine from the same date showed at L4-5 "disc degeneration
with minimal disc bulging [which] creates no significant central spinal canal or neural foraminal
compromise."  A.R. 494.  The MRI showed that the facet joints at L4-5 were unremarkable, and
noted "mild bilateral facet arthrosis" at L5-S1.  A.R. 494.  The impression was "L4-5 minimal
annular disc bulge" and "L5-S1 mild bilateral facet arthrosis."  A.R. 494.

### I.  2009: Treatment by Dr. Holly Kelly

United States District Court

For the Northern District of California

On December 28, 2009, Plaintiff was seen by Dr. Holly Kelly for his lumbar spine, on referral by Dr. Lawler.  A.R. 473.  Dr. Kelly noted that Plaintiff's November 13, 2009 spinal MRI showed "some minimal disc degeneration and mild facette arthritis bilaterally," but no disc pathology or neural Plaintiff that she saw "no evidence of any neurologic lesions coming from the lumbar spine but certainly [Plaintiff's] MRI of the lumbar spine could miss a more distal lesion along the sciatic nerve that could have occurred due to a traction injury from his original trauma." A.R. 475.  Dr. Kelly recommended further investigation via an EMG/nerve conduction study to determine whether there was a more peripheral nerve component to his symptoms.  Dr. Kelly noted that she would request the study with worker's comp.  A.R. 475.

Dr. Kelly performed a physical examination of Plaintiff and reported the following:

When asked to transfer from sit to stand he does this slowly but is able to do it independently. His first few steps are very slow and with small stride. He states he feels his hips popping when he does this.  I am not able to appreciate that with direct palpation while he ambulates.

Lumbar flexion is guarded and to 40 degrees.

Extension is to 20 degrees.

He describes tenderness over the spinous processed to palpation. There is no evidence of deformity or stepoff.  Pelvis is level without obliquity. There is no evidence of scoliosis.

MMT 5 out of 5 throughout the bilateral lower extremities with hip flexion, knee extension, ankle dorsiflexion, plantar flexion, and extensor hallucis longus testing.
Sensory examination is intact to sharp/dull discrimination.

Reflexes +1 and symmetric at the knees and ankles bilaterally. No increased tone or clonus in the lower extremities.

Straight leg raise negative bilaterally other than significant for tight hamstrings. There is no radicular component elicited with this test. Hip range of motion on the left is full and does not recreate pain . . .

On the right, hip external rotation beyond 15 degrees recreates some complaints of groin pain and lateral thigh pain. Internal rotation is full. He is tender to palpation over the right greater trochanteric bursa.

A.R. 474.  Dr. Kelly's assessment was that the examination was "significant for decreased right hip range of motion and reproduction of part of his pain as well as for some greater trochanteric bursitis on right side . . . .  His right hip does still seem to be irritated even though the updated right hip MRI was negative for any new pathology."  A.R. 474-75.  Dr. Kelly recommended a diagnostic and

United States District Court

For the Northern District of California

1    therapeutic right hip injection and a greater trochanteric bursa injection for Plaintiff's right hip pain.

2    A.R. 475.

3         **I.  2010: Opinion of Dr. Weinberg**

4         On January 5, 2010, Dr. Weinberg, a nonexamining physician acting as an independently

5    contracted medical consultant for worker's comp, reviewed certain of Plaintiff's medical records and

6    found that "[t]here are no neurological findings found on exam to support the medical necessity of

7    the electrodiagnostic study" but found that the study "may be reasonable as part of the discovery

8    process."  A.R. 533-35 (Utilization Review Assessment of Dr. Weinberg).  Dr. Weinberg then

9    approved Dr. Kelly's request for an EMG/nerve conduction study of the lower extremities as part of

10   the discovery process.  A.R. 535.

11        **J.  2010: Medical Source Statement of Dr. Lawler**

12        In a statement dated March 5, 2010, Dr. Lawler opined that Plaintiff required alternation

13   between sitting, standing, and walking to relieve his discomfort.  A.R. 564.  Dr. Lawler found that

14   Plaintiff could sit 30 minutes before changing positions, stand 30 minutes before changing positions,

15   and had to walk every 90 minutes for 15 minutes each time.  Dr. Lawler stated that Plaintiff required

16   the opportunity to shift at will between sitting and standing/walking.  A.R. 564.  Dr. Lawler based

17   this opinion on medical findings regarding Plaintiff's "pain in hip, surgeries x 2, [and] lumbar spine

18   nerve compression."  A.R. 564-65.

19        **III.  The Five-Step Sequential Evaluation Process**

20        To qualify for disability benefits, a claimant must demonstrate a medically determinable

21   physical or mental impairment that prevents her from engaging in substantial gainful activity[2] and

22   that is expected to result in death or to last for a continuous period of at least twelve months.

23   *Reddick v. Chater,* 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The

24   impairment must render the claimant incapable of performing the work she previously performed

25   and incapable of performing any other substantial gainful employment that exists in the national

26   _____

27        [2] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

28

11

United States District Court
For the Northern District of California

economy. *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled

3. At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4. At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5. At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett,* 180 F.3d at 1098-99.

### IV.  The August 23, 2011 Decision By The ALJ

In the August 23, 2011 decision, the ALJ applied the five-step sequential evaluation to determine whether Plaintiff was disabled.  A.R. 15-30.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of September 23, 2003 through his date last insured of December 31, 2008.  A.R. 17.  At Step Two, the

United States District Court

For the Northern District of California

ALJ found that the evidence establish that Plaintiff had the following "severe" impairments: back pain, bilateral hip pain, and depression.  A.R. 17.  At Step Three, the ALJ found that Plaintiff's impairment did not meet or equal a presumptively disabling impairment in the Listings.  A.R. 21.  At Step Four, the ALJ found that Plaintiff was "unable to perform any past relevant work" through the date last insured.  A.R. 24.  The ALJ determined that Plaintiff had the "residual functional capacity to perform work . . . except with the ability to lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand and/or walk 2 hours in an 8-hour workday; alternate sitting and standing as needed; no repeated bending or stooping; no climbing of ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; and is limited to one-to-two step instruction jobs."  A.R. 21.  At Step Five, the ALJ determined that Plaintiff was not disabled because there were a significant number of jobs in the national economy that Plaintiff could perform, considering his age, education, work experience, and RFC.  A.R. 24-25.

**V.  Issue Presented**

Plaintiff offers a single argument for reversing the ALJ's decision: that the ALJ erred in determining the sit/stand limitation in Plaintiff's RFC, such that the ALJ's determination that there were a significant number of jobs in the national economy, which depended on Plaintiff's RFC, constituted reversible error.

**VI.  Standard of Review**

The ALJ's underlying determination "will be disturbed only if it is not supported by substantial evidence or it is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (internal quotation marks omitted).  "Substantial evidence" is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is "more than a mere scintilla" but less than a preponderance.  *Id*.  If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony, resolving ambiguities, and drawing inferences

United States District Court

For the Northern District of California

logically flowing from the evidence. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982); *Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## VII. Discussion

Plaintiff testified, and his wife corroborated, that Plaintiff could only sit for 10-15 minutes at a time, but then would have to leave his work area to walk for 5-10 minutes. A.R. 63. Plaintiff's treating orthopedic surgeon, Dr. Lawler, opined that Plaintiff had to walk every 90 minutes for 15 minutes each time. A.R. 564. Despite Plaintiff's testimony and Dr. Lawler's opinion, the ALJ did not find that Plaintiff's RFC required him to walk periodically; instead, the ALJ found only that Plaintiff could sit for 6 hours and stand for 2 hours in an 8-hour workday, and would have to alternate sitting and standing as needed.

In reaching this opinion, the ALJ discounted both Plaintiff's testimony and the opinion of Dr. Lawler:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements regarding concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> Claimant's testimony that he suffers from very severe pain is not supported by the mild objective findings. With regard to this activities of daily living, he is able to prepare food for his children, fold clothes, take walks, go to the store with his wife, and help with cooking, washing dishes, and washing cars.
>
> Although the objective medical evidence is mild as discussed above, the undersigned has given claimant the benefit of the doubt and limited him to sedentary work with a sit/stand option. This is based on the impingement of his right hip joint, residual pain from his right hip surgery, and the fact that he needs a hip replacement. The undersigned gives limited weight to Dr. Lawler's opinion at Exhibit 19F/4-5 [Dr. Lawler's March 5, 2010 statement] since the objective findings are very mild, especially mild findings on MRI of the lumbar spine (Exhibit 12F/6 [Report from Dr. Kelly dated Dec. 28, 2009]), mild antalgic gait (Exhibit 9F/4 [Supplement Report from Dr. Miles dated Feb. 28, 2006]), and negative straight leg raising (Exhibit 12F/6 [Report from Dr. Kelly dated Dec. 28, 2009]).

A.R. 23-24.

14

**United States District Court**
For the Northern District of California

**A. Subjective Pain Testimony**

Plaintiff sole argument in this appeal is that the ALJ improperly discounted his subjective pain testimony. On that basis, Plaintiff challenges the ALJ's finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible. A.R. 23. The court will examine this finding to determine whether it was supported by substantial evidence. *See Thomas v. Barnhart*, 278 F.3d 947, 950 (9th Cir. 2002) (the court may not second-guess the ALJ's credibility finding if it is supported by substantial evidence in the record).

In deciding whether to admit a claimant's subjective complaints of pain, the ALJ must engage in a two-step analysis. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)). First, "the claimant must produce objective medical evidence of underlying 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably be expected to produce pain or other symptoms.'" *Id.* (quoting *Smolen*, 80 F.3d at 1281-82). The *Smolen* court further elaborated on this requirement:

> The claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment could reasonably be expected to produce pain or another symptom, [this step] requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon . . . . This approach reflects the highly subjective and idiosyncratic nature of pain and other such symptoms.

*Smolen*, 80 F.3d at 1282 (citations omitted). The ALJ found that Plaintiff had satisfied this first step of the analysis. A.R. 23.

If the first step is satisfied, then the ALJ may consider whether the claimant's statements about the intensity, persistence, and limiting effects of those symptoms are credible and consistent with objective medical evidence. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007); 20 C.F.R. § 416.929(c). If an ALJ discredits a claimant's subjective symptom testimony, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (quotations omitted). The ALJ must support a finding that the claimant's subjective testimony is not reliable with specific, clear and convincing evidence from the record. *Thomas*, 278 F.3d at 958-59. The ALJ may consider "ordinary techniques of credibility evaluation," including the

claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284.

The ALJ gave several reasons for discounting Plaintiff's subjective pain testimony. First, the ALJ diminished Plaintiff's credibility because his daily activities exceeded what would be expected of an individual with his alleged level of pain. In arriving at this conclusion, the ALJ focused on Plaintiff's testimony that is able to prepare food, fold clothes, take walks, go shopping, and help with cooking, washing dishes, and washing cars. A.R. 23.[3] A claimant's daily activities may be considered by the ALJ when determining the credibility of the claimant's subjective pain testimony. *Smolen*, 80 F.3d at 1284; *Fair v. Bowen*, 885 F.2d 579, 603 (9th Cir. 1989) (if a claimant can perform household chores and other activities that involve similar physical tasks as a job, an ALJ may conclude that the claimant's pain does not prevent him from working).

Second, the ALJ discounted Plaintiff's credibility because they were inconsistent with the "mild objective [medical] findings." A.R. 23. The mild findings noted by the ALJ included the MRIs from November 2009, which showed that Plaintiff's right hip was "unremarkable" and that Plaintiff's lower back showed only "minimal annular disc bulge at L4-5 and mild bilateral facet arthrosis at L5-S1," A.R. 19, as well as Dr. Weinberg and Dr. Kelly's findings that there was no apparent neurological basis for Plaintiff's back pain. A.R. 20, 475.

In addition, the ALJ also noted that the medical evidence of record showed that Plaintiff had not accessed medical treatment for over a year, that Dr. Miles had suggested a conservative course of treatment including non-narcotic medications and sparing use of narcotic medications, and that Dr. Miles had noted that Plaintiff had not yet accessed vocational rehabilitation even though it had offered. The ALJ is permitted to consider each of these facts when determining the credibility of Plaintiff's testimony. *Smolen*, 80 F.3d at 1284 (ALJ may consider claimant's failure to seek

---

[3] However, the ALJ focused solely on the types of activities that Plaintiff testified he could do, and omitted reference to the limitations noted by Plaintiff in performing such activities, e.g., that Plaintiff could only fold laundry for 10-15 minutes, that he could only walk a quarter to half a mile before having to stop due to pain, that he bought groceries with his wife only once every two or three weeks, and that even on good days, he had to take breaks from housework every 20 minutes. A.R. 39, 44-48.

United States District Court
For the Northern District of California

1    treatment when determining a claimant's subjective pain testimony); SSR 96-7p, 1996 WL 374186

2    at *7 ("the individual's statements may be less credible if the level or frequency of treatment is

3    inconsistent with the level of complaints"); *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007)

4    ("evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding

5    severity of an impairment).  However, as set forth below, the medical record is more complicated

6    than suggested by the ALJ in discounting Plaintiff's credibility.

7    **B.   Rejection of Uncontradicted Opinions of Treating Physicians**

8            The court next examines whether the ALJ properly gave reduced weight to Dr. Lawler's

9    opinion regarding Plaintiff's sit/stand limitation.[4]

10           When reviewing an ALJ's medical opinion determinations, courts distinguish between three

11   types of physicians: those who treat the claimant ("treating physicians"); and two categories of

12   "nontreating physicians," those who examine but do not treat the claimant ("examining physicians")

13   and those who neither examine nor treat the claimant ("nonexamining physicians").  *See Lester*, 81

14   F.3d at 830.  A treating physician's opinion is entitled to more weight than an examining physician's

15   opinion, and an examining physician's opinion is entitled to more weight than a nonexamining

16   physician's opinion.  *Id.*  The ALJ is entitled to resolve conflicts in the medical evidence.  *Sprague*

17   *v. Bowen,* 812 F.2d 1226, 1230 (9th Cir. 1987).

18           To reject the opinion of an uncontradicted treating or examining physician, an ALJ must

19   provide "clear and convincing reasons."  *Lester*, 81 F.3d at 830.  *See also* 20 C.F.R. § 416.927(d)(2);

20   SSR 96-2p, 1996 WL 374186.  If another doctor contradicts a treating or examining physician, the

21   ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount

22   the treating or examining physician's opinion.  *Lester*, 81 F.3d at 830-31.  The ALJ meets this

23   burden "by setting out a detailed and thorough summary of the facts and conflicting clinical

24   evidence, stating his interpretation thereof, and making findings."  *Reddick*, 157 F.3d at 725.  A

25   _____

26           [4]  Although Plaintiff did not specifically raise this argument, Plaintiff does argue that the ALJ
     improperly determined the extent of Plaintiff's sit/stand limitation in posing hypothetical scenarios to
27   the VE.  An essential element of the ALJ's determination of Plaintiff's sit/stand limitation was the ALJ's
     decision to discount Dr. Lawler's opinion regarding the sit/stand limitation.  Thus the court will consider
28   whether the ALJ erred in so doing.

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1  nonexamining physician's opinion alone cannot constitute substantial evidence to reject the opinion

2  of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990),

3  though it may be persuasive when supported by other factors.  *See Tonapetyan*, 242 F.3d at 1149;

4  *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given

5  contradictory laboratory test results, reports from examining physicians, and testimony from

6  claimant).  An opinion more consistent with the record as a whole generally carries more

7  persuasiveness.  *See* 20 C.F.R. § 416.927(d)(4).

8      Here, because no other physician offered an opinion about Plaintiff's sit/stand limitation, Dr.

9  Lawler's opinion, indicated on a check-off form, that Plaintiff must walk for 15 minutes every 90

10  minutes is uncontradicted.  As such, the ALJ must offer "clear and convincing reasons" for rejecting

11  Dr. Lawler's opinion.  *See Lester*, 81 F.3d at 830 (to reject the opinion of an uncontradicted treating

12  physician, an ALJ must provide "clear and convincing reasons").  In the ALJ's decision, the ALJ

13  gave limited weight to Dr. Lawler's opinion because "the objective findings are very mild,

14  especially mild findings on MRI of the lumbar spine (Exhibit 12F/6 [Report from Dr. Kelly dated

15  Dec. 28, 2009]), mild antalgic gait (Exhibit 9F/4 [Supplement Report from Dr. Miles dated Feb. 28,

16  2006]), and negative straight leg raising (Exhibit 12F/6 [Report from Dr. Kelly dated Dec. 28,

17  2009]).  A.R. 24.

18      But closer inspection of these three "mild" objective findings that the ALJ sets forth show that

19  the ALJ did not present clear and convincing reasons for discounting Dr. Lawler's uncontroverted

20  opinion of Plaintiff's sit/stand limitation.  First, the objective findings of Plaintiff's "mild antalgic

21  gait" were from Dr. Miles' supplemental report, dated February 28, 2006, which *predates* Plaintiff's

22  two hip surgeries.  Second, the mild findings of the MRI of Plaintiff's lumbar spine are indeed

23  supported by Dr. Kelly's December 2009 report, which generally found mild or minimal problems,

24  and recommended further investigation.  However, these findings focused on Plaintiff's lumbar

25  spine.  With respect to Plaintiff's right hip, Dr. Kelly's assessment (and the record as a whole) was

26  less favorable.  While Dr. Kelly did test Plaintiff's straight leg raise and report that it was "negative

27  bilaterally other than significant for tight hamstrings," A.R. 474, Dr. Kelly also noted that Plaintiff's

28  external rotation of Plaintiff's right hip "beyond 15 degrees recreates some complaints of groin pain

and lateral thigh pain" and that Plaintiff "is tender to palpation over the right greater trochanteric bursa." A.R. 474. Dr. Kelly's assessment was that the examination was "significant for decreased right hip range of motion and reproduction of part of his pain as well as for some greater trochanteric bursitis on right side . . . . His right hip does still seem to be irritated even though the updated right hip MRI was negative for any new pathology." A.R. 474-75.

Dr. Kelly's findings of Plaintiff's pain and limited mobility with respect to his right hip in December 2009 are echoed in Dr. Lawler's findings in October 2009 that Plaintiff was "having recurrent popping within his right hip, causing a catching sensation and significant pain," as well as "persistent nightly numbness or tingling with burning into his legs, down the posterior thighs, onto the bottoms of his foot bilaterally." A.R. 476. Dr. Lawler opined that Plaintiff "is probably a candidate for hip replacement, either hip resurfacing or primary total hip arthroplasty" because Dr. Lawler was "not very confident that a repeat surgery despite his mechanical symptoms would be much use." A.R. 477. Dr. Lawler stated that Plaintiff "is becoming increasingly disabled from this." A.R. 476. The picture that emerges from the medical record is not that Plaintiff was unaffected by his right hip, but rather that the source of the pain in Plaintiff's right hip was a puzzle that Plaintiff's treating doctors recommended further investigation to solve.

It is true that the ALJ may give somewhat reduced weight to Dr. Lawler's opinions in March 2010 regarding Plaintiff's sit/stand limitation because they were presented on a check-off form. *See Magallanes*, 881 F.2d at 751 ("The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability. The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted. For example, the ALJ need not accept a treating physician's opinion which is brief and conclusionary in form with little in the way of clinical findings to support its conclusion.") (citations and quotations omitted). However, it is also true that Dr. Lawler was one of Plaintiff's key treating physicians. He treated Plaintiff for several years, performed two surgeries, and continued to follow up after the second surgery. His treatment notes are detailed and non-conclusory, and include clinical findings. Dr. Lawler thus had ample opportunity to observe Plaintiff and comment knowledgeably about his condition. In light of the medical record as a whole, this court cannot conclude that the ALJ

United States District Court

For the Northern District of California

1   presented clear and convincing reasons for refusing to credit Dr. Lawler's opinion that Plaintiff

2   would need to walk for 15 minutes every 90 minutes.  This amounts to legal error.[5]

3          If there are no clear and convincing reasons to discount Dr. Lawler's testimony, then the ALJ's

4   hypothetical to the VE should have included Dr. Lawler's opinion regarding Plaintiff's sit/stand

5   limitation.  The VE's testimony on a similar limitation suggests that a person with the limitation

6   described by Dr. Lawler would not be employable and would therefore be considered disabled.  *See*

7   A.R. 64 (VE's opinion that somebody who would have to walk around for 5-10 minutes after sitting

8   for 10-15 minutes, assuming that person "wouldn't be continuing to work with continuity when he's

9   walking around," would not be employable; and that a person who required "walking even ten

10  minutes of an hour throughout the day" would not be employable).  Thus the ALJ's erroneous

11  decision to discount Dr. Lawler's testimony is not harmless because it may be consequential to the

12  ALJ's ultimate determination of Plaintiff's nondisability.  *See Tommasetti v. Astrue*, 533 F.3d 1035,

13  1038 (9th Cir. 2008) ("[T]he court will not reverse an ALJ's decision for harmless error, which

14  exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate

15  nondisability determination.") (citations and internal quotation marks omitted).

16                                         **VIII. CONCLUSION**

17         For the foregoing reasons, the court finds that the ALJ's rejection of Dr. Lawler's

18  uncontradicted opinion regarding Plaintiff's sit/stand limitation was not supported by clear and

19  convincing reasons.  This in turn may have improperly affected the ALJ's assessment of Plaintiff's

20  subjective symptom testimony.

21  //

22  //

23  //

24

25

26  _____

27         [5] Dr. Lawler's opinion tends to support Plaintiff's testimony regarding his pain and physical
    limitations.  By discounting Dr. Lawler's opinion, the ALJ also discounted Plaintiff's credibility.  In
28  other words, had the ALJ credited Dr. Lawler's opinion about Plaintiff's limitations, it is more likely
    that the ALJ would have found Plaintiff's testimony more credible.

Defendant's motion for summary judgment is therefore **denied**, and Plaintiff's motion for summary judgment is **granted**.  The court remands this case for further proceedings not inconsistent with this opinion.

Dated:  December 17, 2014

IT IS SO ORDERED



DONNA M. RYU
United States Magistrate Judge

United States District Court
For the Northern District of California